UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

EOG RESOURCES, INC.,

               Plaintiff,                     Civil Action No. 2:23-cv-4232

      v.                             Judge Edmund A. Sargus, Jr.
                                       Magistrate Judge Chelsey M. Vascura

LUCKY LAND MANAGEMENT, LLC,

               Defendant.

## OPINION AND ORDER

This matter is before the Court for consideration of Plaintiff EOG Resources, Inc.'s

Motion for Preliminary Injunction. (Mot., ECF No. 3.) Defendant Lucky Land Management,

LLC opposed that Motion (Opp., ECF No. 20), and EOG replied (Reply, ECF No. 23). The

Court held a held a Hearing on February 13, 2024, and the parties also filed post-hearing

briefing. (ECF Nos. 36–40.) For the reasons below, the Motion is **GRANTED**.

## BACKGROUND

### I.    Factual Background

This dispute centers on 313.320 acres of property in Noble County, Ohio. Lucky Land

Management acquired the surface rights to the property in 2022, but the property was subject to

an oil and gas lease that gave EOG mineral rights to the property. The question is whether EOG

can use its access to the surface of Lucky's property to recover oil and natural gas from under

Lucky's property as well as from under adjacent properties using horizontal drilling.

#### A.  EOG's Oil and Gas Lease

In the 1950s, the then-owner of the property at issue severed title to the oil and gas rights

from the surface rights of the property. Franklin Real Estate Company, the then-owner,

transferred interest in the surface estate, while reserving to itself and future lessees title to the

minerals under the surface, including the oil and gas. (Mot., PageID 203.) Franklin Real Estate

did so with the following reservation of rights, included in all the Severance Deeds transferring

interest in the property:

> The Grantor, The Franklin Real Estate Company, hereby excepts from the above-
> described real estate and reserves unto itself, its successors and assigns, any and all
> oil, petroleum and natural gas, and all rents and royalties therefrom, and rights
> thereto, conveyed to or acquired by it under or by virtue of the above-mentioned
> deed; together with the right to enter in and upon the above-described real estate and
> prospect for, drill, recover and remove the oil, petroleum and natural gas, and all
> necessary and proper rights in connections therewith, provided, however, that the
> rights herein excepted and reserved shall not be exercised in such manner as to
> interfere with the mining and removal of the coal in and under the above-described
> real estate.

(Verified Compl., ECF No. 2, ¶ 9; ECF No. 2-2, PageID 29.)

Franklin Real Estate's successor-in-interest, Ohio Franklin Realty, LLC, leased the oil

and gas rights to Artex Energy Group, LLC. (Lease, ECF No. 2-3; *see also* ECF No. 2-4,

recorded in the chain of title as Memorandum of Lease.) Artex, in turned assigned the oil and gas

rights to R&S Operating LLC (ECF No. 2-5), which then assigned the oil and gas rights to EOG.

(Verified Compl., ¶ 10.)[1]

The Lease gives the lessee the right to:

> [I]nvestigate, explore, prospect, drill and operate for and produce therefrom
> oil, gas, casing-head gas, casing head gasoline, hydrocarbons . . . and brine . . .
> in, on and under the [property]. . . ingress and egress over [the property] as
> may be reasonably necessary for the purposes set forth herein . . . construct
> communication and electrical lines . . . lay on [the property] oil and gas
> gathering lines . . . erect necessary structures and equipment on [the property] . . .

(Lease, PageID 39.)

---

[1] R&S first assigned the Lease to EOG through an unrecorded Assignment in 2022. (ECF
No. 2-6.) Then, in August 2023, R&S assigned the Lease to EOG and recorded that Assignment
and Bill of Sale on September 12, 2023, at vol. 391, pg. 117–149 of the Noble County
Recorder's Office. (ECF No. 2-7.)

### B. Lucky's Ownership of the Surface of the Property

Lucky acquired ownership of the surface of the property on November 14, 2022, through a Limited Warranty Deed from CNX Land, LLC. (Lucky Deed, ECF No. 2-1.) That Deed conveyed "the SURFACE ONLY" of the approximately 313.320 acres of property. (*Id.* at PageID 16) (emphasis in original). Lucky acquired this property to create a fertile hunting ground for white tail deer. (Opp., ECF No. 20, PageID 263.)

Brian Lucky, the CEO of Lucky Land Management, testified at the Hearing that Lucky selected the property because it possessed ideal water sources, tree cover, undergrowth, and food sources that could support the "highest deer population in the area." (Opp., PageID 264; Lucky Aff., ECF No. 20-2, ¶ 8; *see also* ECF No. 36.) Since purchasing the property, Lucky made investments to ensure the deer developed to their "full potential." (Lucky Aff., ¶ 17, referring to weight and antler growth.) In the first hunting season, Lucky removed as many "undesirable or non-trophy animals" as it could. (*Id.* ¶ 18.) Lucky also invested in feeders for the deer, and access roads so that hunters could access the property without detection to prevent disruptions to the deer mating. (*Id.* ¶ 19–24.)

### C. Conflict Over EOG's Use of the Surface of the Property

EOG intends to exercise its rights under the Lease to develop and produce oil and gas from under Lucky's property, "as well as from under a variety of nearby properties." (Reply, ECF No. 23, PageID 312.) To do so, EOG plans to erect two horizontal well pads on the surface of the property. (Mot., PageID 205.) The pad will each contain multiple oil and gas wells. (*Id.*) According to the testimony of Jason Boykin at the Hearing, EOG's Supervisor of Right-of-Way and Lease Operations, the proposed horizontal well pads will each encompass less than five

acres, or fewer than 10 total acres, [2] of Lucky's property. (ECF No. 36.) Factoring in the acres impacted by construction, Mr. Boykin estimates that the area of disturbance on the surface would be limited to around 45 acres. (*Id.*) Mr. Boykin also explained that if EOG only produced oil from beneath the surface of Lucky's property (i.e., by vertical drilling), EOG would need to install 16 vertical well pads, spread out across the seven parcels of property that make up Lucky's 313.320 acres. (*Id.*) The surface impact of the vertical wells alone, without accounting for construction, would be roughly 32 acres. (*Id.*)

Initially, Lucky allowed EOG to perform seismic surveys on the property. (Mot., PageID 204.) But when Lucky learned of EOG's plans for the property, Lucky refused EOG any further access in connection with its oil and gas activities. (*Id.*) Between July 2023, and December 2023, EOG tried to negotiate access to begin construction of two oil and gas well pads, associated structures, roads, and a utility corridor. (*Id.*) EOG offered an "increased financial incentive" in December 2023 to no avail. (Verified Compl., ¶ 22.) Jason Boykin testified that EOG offered to enter into two separate Surface Use Agreements to develop and maintain a good working relationship with Lucky. (ECF No. 36.) First, EOG offered Lucky $40,000 to release EOG from any surface damages that could arise in connection with the construction and operation of the well pads. (ECF No. 36, Exhibit I.) When Lucky rejected that proposal, EOG increased its offer to $100,000. (*Id.*, Exhibit J.) EOG maintains that it did not have to enter an agreement of this sort but wanted to maintain a good working relationship with Lucky. (*Id.*) Nonetheless, Lucky

---

[2] While Mr. Boykin testified that the surface impact of the two well pads would be less than 10 acres, EOG submitted in its Verified Complaint that each horizontal well pad would encompass 10 to 15 acres of property, with a total surface impact of roughly 30 acres. (Verified Complaint, ECF No. 2, ¶ 23.)

continued to reiterate its position that unless EOG would buy the surface rights, Lucky would not allow EOG access to the surface. (*Id.*)

Mr. Lucky testified that he knew that another company owned the mineral estate of the property, through an oil and gas lease, when he bought the property. (ECF No. 36; *see also* Opp., PageID 261.) But he said he did not know that EOG planned to expand the size of the existing well pad. (Opp., PageID 261.) Mr. Lucky testified that he also did not know where EOG intended to place the new well pads, which is why he invested in clearing certain portions of surface and placing food plots on the property. (ECF No. 36; ECF No. 38, PageID 1540.) EOG now seeks to place the two horizontal well pads in the same location where Lucky installed the food plots. (*Id.* at PageID 1540.) Mr. Lucky fears he will lose his entire investment and be unable to sell the property if EOG builds its well pads there. (*Id.*) He contends that EOG's planned drilling operation threatens the habitat Lucky carefully cultivated, prevents Lucky from realizing profits, and may impede Lucky's ability to eventually sell the property. (Opp., PageID 267.)

Lucky does not dispute that EOG has the right to the oil and gas beneath its surface rights. (Opp., PageID 247.) But Lucky objects to the placement of the two horizontal well pads and argues EOG's proposed use is unreasonable. (*Id.*; *see also* ECF No. 38, PageID 1540.) While EOG represents that the well pads will encompass less than 10 acres of property (*see* ECF No. 38), Lucky asserts upwards of 60 acres will be affected (Opp., PageID 245). Lucky posits that the total area affected will be far greater than EOG suggests because the well pads will require a construction pad or a gravel staging area on the property for several years, as well as roads and power lines. (*Id.*)

The area EOG selected to place the well pads is also where Lucky concentrated its investment in the property. (ECF No. 38, PageID 1540.) The high, flat, and dry area is desirable

to both parties. (*Id.*) With this in mind, Lucky invested approximately $300,000 to clear the area and place food plots for the white tail deer population. (*Id.*) According to Mr. Lucky, these food plots are one of the property's largest selling points as a hunting property. (*Id.* at PageID 1538.)

According to EOG, Lucky's refusal to allow EOG access to the surface of the property threatens to disrupt EOG's development plan. (Mot., PageID 205.) Lucky has not only refused EOG access to the surface, but also refused to respond to EOG's requests for input regarding the placement and design of the well pads and the accompanying infrastructure. (ECF No. 37, PageID 1535.) To develop the property, EOG explains, it must first clear the trees off the property. (Mot., PageID 205.) But federal regulations require that trees be cleared by March 31, 2024, to protect certain species of endangered bats. (*Id.*) If Lucky does not allow EOG to remove the trees before March 31, EOG will suffer additional delays by waiting until the next tree clearing period begins in October 2024. (*Id.*) Beyond impeding the tree removal, Lucky's interference prevents EOG from utilizing corridor development, maximizing labor and infrastructure efficiencies, and enjoying economies of scale. (*Id.*)

Despite mutual efforts towards settlement, the parties have been unable resolve their dispute. Accordingly, EOG filed its Complaint (ECF No. 2) and Motion for Preliminary Injunction on December 22, 2023.

## II.     Procedural Background

EOG's Complaint seeks injunctive and declaratory relief, as well as compensatory damages for conversion. EOG alleges that Lucky is improperly interfering with its right to access and make reasonable use of the surface of the property to, among other things, construct and operate two horizontal oil well pads. (Verified Compl., ¶ 33.) EOG filed its Motion for a Preliminary Injunction on the same day as its Complaint, moving the Court to enjoin Lucky from

"barring or otherwise interfering with EOG's use of the surface of the property in connection with its lease of the severed oil and gas rights underlying the property." (Mot., PageID 200.)

After EOG's Motion for a Preliminary Injunction was ripe, the Court held a Hearing on February 13, 2024. (ECF No. 36.) The Court ordered additional briefing at that Hearing, and the parties have submitted their briefs (ECF Nos. 37, 38), and replied (ECF Nos. 39, 40). The Court now addresses EOG's Motion.

## ANALYSIS

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). "The purpose of a preliminary injunction, unlike a permanent one, is to prevent any violation of the plaintiff's rights before the district court enters a final judgment." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 372 (2022) (quoting *Ohio v. EPA*, 969 F.3d 306, 308 (6th Cir. 2020)).

To determine the appropriateness of a preliminary injunction, the Court must examine four factors: (1) whether the plaintiff has established a strong likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury if a preliminary injunction did not issue; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served if the court were to grant the requested injunction. *Leary*, 228 F.3d at 736. Each of these factors "are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Id.* EOG submits that all four factors

support a preliminary injunction. (Mot., PageID 206.) Lucky argues that EOG cannot establish

that it is likely to succeed on the merits. (Opp., PageID 245.)

## I.    Likelihood of Success on the Merits

EOG must first prove that its claims have a strong likelihood of success on the merits.

While a plaintiff need not prove its entire case at this stage, "to establish success on the merits, a

plaintiff must show 'more than a mere possibility of success.'" *Black v. Cincinnati Fin. Corp.*,

No. 1:11-cv-2010, 2011 U.S. Dist. LEXIS 46852, at *6 (S.D. Ohio May 2, 2011) (Barrett, J.)

(quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543

(6th Cir. 2007) (internal quotations omitted)). "Although no one factor is controlling, a finding

that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd.

of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

The parties' central dispute is over whether EOG, as the holder of a mineral estate, has

the right to use the surface to drill oil and natural gas from under both the surface estate and from

under neighboring properties. EOG argues that it has a strong likelihood of success on the merits

because the Severance Deeds each broadly reserved the right to use the surface of the property to

drill, recover, and remove oil and natural gas from under Lucky's property as well as from under

neighboring properties. (Mot., PageID 209.) EOG argues that this broad express right, coupled

with the Ohio law that the owner of a severed mineral interest has the implied right to use the

surface to develop and produce the severed minerals, makes clear that it is likely to prevail on the

merits. (Mot., PageID 207; Reply, PageID 314 (citing *Snyder v. Ohio Dep't of Nat. Res.*, 140

Ohio St. 3d 322 (Ohio 2014)).

Lucky does not dispute that EOG has the right to use the surface of its property to drill

for oil under its property; but it argues that the Severance Deeds and the later Lease do not give

8

EOG the express right to drill for oil from under other neighboring properties. Lucky further contends that the owner of a mineral estate does not have the implied right to use the surface to produce oil and natural gas from adjacent tracts. To do so, Lucky argues that EOG needs Lucky's express agreement and to compensate Lucky accordingly. (Opp., PageID 246–47.)

At the outset, considering Lucky's concession, the Severance Deeds, and the clear language of the Lease, the Court finds that EOG has shown a strong likelihood of success on the merits in proving that EOG has right to use the surface of the property to drill and produce minerals under the property. (*See infra*, Part I.D.) The Court thus narrows its inquiry to whether EOG has the right to use its access to the surface to drill for oil and natural gas under neighboring lands. The Court will first analyze whether the Severance Deeds and the Lease give EOG an express right to horizontally drill for the oil under neighboring properties, and then will analyze whether EOG has an implied right.

### A. The Reservation of Rights is Ambiguous as to Horizontal Drilling

EOG first argues it is entitled to a preliminary injunction because the reservation of rights included in the Severance Deeds expressly grants EOG the right to drill for oil not only under Lucky's property, but also from under neighboring tracts. The Court disagrees and finds that the reservation of rights is ambiguous regarding EOG's right to extract oil and natural gas from neighboring properties.

In Ohio, deeds like other written instruments, "are to be interpreted so as to carry out the intent of the parties." *Long Point Energy, LLC v. Gulfport Energy Corp.*, No. 2:20-cv-4644, 2023 U.S. Dist. LEXIS 52440, at *13 (S.D. Ohio Mar. 27, 2023) (Morrison, J.) (quoting *Wells v. Am. Elec. Power Co.*, 48 Ohio App. 3d 95, 97, 548 N.E.2d 995, 997 (1988)). The best indication of intent arises from the words set forth in the deed. *Id.* (citing *Apel v. Katz*, 83 Ohio St.3d 11,

9

17, 1998-Ohio-420, 697 N.E.2d 600, 605 (1998)). "Where the language of the deed is

unambiguous, its proper interpretation is a question of law to be resolved by the court without

resort to extrinsic evidence." *Id.* (quoting *Belville Min. Co. v. United States*, 999 F.2d 989, 995

(6th Cir. 1993))

      While there is not an abundance of on point case law, the Sixth Circuit's analysis in

*Eclipse Res. - Ohio, LLC v. Madzia* is instructive. 717 F. App'x 586, 587 (6th Cir. 2017). There,

the Sixth Circuit held that the owner of an oil and gas lease had the unambiguous right to drill a

wellbore through the surface owner's property to access neighboring resources. *Id.* But the

language in the *Eclipse* lease gave the lessee rights to "all of the oil and natural gas from *any*

*source*" and expressly used the language "and other lands." *Id*. at 588 (emphasis in original).

      Here, each of the Severance Deeds includes the following reservation of rights:

> The Grantor, The Franklin Real Estate Company, hereby excepts from
> the above-described real estate and reserves unto itself, its successors and
> assigns, any and all oil, petroleum and natural gas, and all rents and royalties
> therefrom, and rights thereto, conveyed to or acquired by it under or by virtue
> of the above-mentioned deed; *together with the right to enter in and upon*
> *the above-described real estate and prospect for, drill, recover and remove*
> *the oil, petroleum and natural gas, and all necessary and proper rights in*
> *connections therewith*, provided, however, that the rights herein excepted
> and reserved shall not be exercised in such manner as to interfere with the
> mining and removal of the coal in and under the above-described real estate.

(ECF No. 2-2, PageID 29 (emphasis added).) This reservation of rights immediately follows a

description of the tract. *Id.* (describing the tract of land "containing 316.42 acres more or less

situated in Sections 13 and 14, Township 7, Range 10, Sharon Township Noble County Ohio and

being the same tract of real estate conveyed [in the] deed dated September 1953 recorded in

Volume 109 Page 391" of the Noble County Recorder's Office.)

      The language in the reservation of rights is distinguishable from the language at issue in

*Eclipse*. The reservation of rights does not include any language affirmatively granting EOG the

right to extract oil from "other lands," nor does it give EOG the right to oil and natural gas from "any source." (*Id.*); *Eclipse*, 717 F. App'x at 588. In fact, it is limited to the "above-described real estate," which is the description of the tract. (*Id.*)

EOG argues that the clause "all necessary and proper rights in connection therewith" broadly includes the right to extract oil and natural gas from under other nearby properties. (Reply, PageID 316.) Even if not read as broadly, at minimum EOG contends that there is no express limitation on EOG's right to extract oil from other properties. (*Id.* at PageID 316–17.)

Lucky refutes EOG's interpretation by arguing that the inclusion of "in and under the above-described real estate" is a clear limitation on the real estate from which EOG has the right to extract oil. (Opp., PageID 249.) While that clause refers to the mining and removal of coal (not natural gas and oil), Lucky argues the limitation applies to the entire reservation of rights. (*Id.*) EOG counters that the inclusion of the limitation language in the last phrase reveals that the drafters knew how to include limitation language, and if they wanted to limit the reservation of rights throughout, they could have. (Reply, PageID 317.)

The Court finds both interpretations reasonable and the intent of the parties unclear as it relates to the horizontal drilling of oil and natural gas from under other properties. Since the reservation of rights is susceptible to more than one reasonable interpretation, the Severance Deeds are ambiguous. *Terlecky v. Nat'l City Mortg. Co. (In re Doutt)*, Nos. 09-64616, 10-2198, 2012 Bankr. LEXIS 4077, at *14 (Bankr. S.D. Ohio Aug. 31, 2012) (citing Ohio caw law and explaining a contract is ambiguous when its terms are reasonably susceptible to more than one interpretation). Accordingly, the Court must look beyond the four corners of the document to effectuate the parties' intent. *Id.* at *15 (describing when a court may consider extrinsic evidence to ascertain the parties' intent).

### B.  Extrinsic Evidence Does Not Remove the Ambiguity

EOG next argues that even if the Court construes the language of the Severance Deeds as ambiguous, it is still likely to prevail on the merits because the historical context supports its interpretation of the reservation of rights. (Reply, PageID 318.) Lucky argues that case law supports its interpretation of the reservation of rights, and the reservation of rights should be construed against the drafter and grantor—EOG's predecessor-in-interest. (Opp., PageID 250.)

### i.  Historical Context Does Not Clarify the Parties' Intent

When a deed is ambiguous, the Court may consider extrinsic evidence "to ascertain the circumstances which surrounded the parties at the time [the deed] was made." *Mosier v. Parry*, 60 Ohio St. 388, 54 N.E. 364, 364 (syllabus ¶ 1) (Ohio 1899). Extrinsic evidence includes "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, (3) any acts by the parties that demonstrate the construction they gave to their agreement." *SFJV 2005, LLC v. Ream*, 2010-Ohio-1615, ¶ 23, 933 N.E.2d 819, 824 (Ohio Ct. App. 2010).

Both EOG and Lucky use extrinsic evidence of the historical context at the time the Severance Deeds were executed to support their interpretations of the reservation of rights. First, EOG offers the rule of capture, a "prevailing legal doctrine" at the time, as evidence that the parties knew that oil and natural gas could be extracted from neighboring properties. (Reply, PageID 320.) Because the parties knew that oil and natural gas could migrate between properties, EOG argues, the parties would have expected to capture their neighbor's oil and gas. (*Id.* at PageID 318; ECF No. 37, PageID 1532.) Since the reservation of rights was broad, and the parties contemplated this drilling technique, EOG posits that the clause "all necessary and proper rights" includes the right to produce oil and gas from other properties. (*Id.* at PageID 320.)

12

Lucky, however, argues that the parties could not have intended to include the right to horizontally drill because horizontal drilling was not a technique contemplated by the parties at the time the Severance Deeds were executed. (Opp., PageID 246.)

The rule of capture allows a property owner to drill for oil and gas from his or her land and acquire title to oil and gas drained from that well that may have migrated from adjoining lands. *Barnes v. Res. Energy Expl*., 2016-Ohio-4805, ¶ 29, 68 N.E.3d 133, 141 (Ohio Ct. App. 2016); *see also Tera II LLC v. Rice Drilling D, LLC*, No. 2:19-cv-2221, 2023 U.S. Dist. LEXIS 112102, at *50 (S.D. Ohio June 28, 2023) (Marbley, J.) (citing Ohio case law, and noting that the rule is limited by the doctrine of correlative rights). Inherent in the rule of capture is an understanding that oil and gas are "wild resources" that move freely and cannot be controlled by traditional legal boundaries or property lines. *Kelley v. Ohio Oil Co.,* 57 Ohio St. 317, 325 (1897). At most, the historical origins of this rule recognize that people did not control how oil moved beneath the surface. *See Barnes*, 2016-Ohio-4805, ¶ 29 (describing oil migrating from adjoining lands). The rule did not affirmatively give adjacent landowners the right to extract oil and gas from under their neighbor's property, nor did it recognize that it was possible to do so.

The rule of capture was also later limited when the Ohio legislature adopted and codified the correlative rights doctrine in Section 1509 of the Ohio Revised Code. *Barnes*, 2016-Ohio-4805, ¶ 29. The doctrine imposes correlative rights and duties which neither the surface estate nor the mineral estate may unreasonably exercise to the injury of the other. *Id.* (describing the doctrine as imposing a landowner's duty to exercise their right to drill for oil and gas without negligence or waste.)

Not only was the doctrine later limited, the Court agrees with Lucky that when the Severance Deeds were executed, horizontal drilling was not a technique widely utilized. (*See*

Opp., PageID 246.) Jason Boykin from EOG also testified that horizontal drilling only became widely used in Ohio within in the past 10 to 15 years. (*See* ECF No. 36.) The parties likely never contemplated extracting oil and gas from under their neighbor's property when they executed the Severance Deeds.

Accordingly, after considering both parties' evidence of historical context, the Court finds such evidence does not remove the ambiguity created by the reservation of rights. *See Skivolocki v. E. Ohio Gas Co.,* 38 Ohio St. 2d 244, 251, 313 N.E.2d 374, 378 (1974) (determining a deed did not include a right to strip mine because deed was executed before the technique was widely employed); *Wiser Oil Co. v. Conley*, 346 S.W.2d 718, 15 O.&G.R. 280 (Ky. 1960) (holding that a lease executed in 1917 likely intended for oil to be produce by drilling in the customary manner, rather than the "new method" of extracting oil through water).

### ii. Case Law Offered by Lucky Does Not Resolve the Ambiguity

Lucky also relies on case law to support its interpretation that the reservation of rights does not include a right to horizontally drill for oil and natural gas under adjacent lands. Lucky cites a case from the Harrison County Court of Common Pleas that held mineral rights do not include the right to use the premises to recover minerals from areas outside the premises. *Jewett Sportsmen & Farmers Club, Inc. v. Chesapeake Expl., LLC, et al.*, Harrison County C.P., CVH-2011-0113; (*see* ECF No. 20-1, PageID 279, 284.) Defendants in that case intended to use hydraulic fracturing through two well pads with eight wellbores to recover oil and gas from under the surface of the property, and from neighboring properties. (*Id.*)

There the severance deed reserved the right to mine and remove "through and under said described premises other coal, oil, gas or other minerals." (*Id.* at PageID 275.) Based on the "through and under" language the Harrison County Court concluded that the deed did not include the right to use the premises to recover or produce minerals from areas outside the premises. (*Id.*)

14

The deed only provided the right to wheel coal through and under the underground passages beneath the subject premises. (*Id.* at PageID 279.) According to that Court, the limitation was significant, purposeful, and indicative of the parties' intentions in the deed. (*Id*.)

But as EOG notes, the severance deed in *Jewett* is distinguishable from the reservation of rights here. Instead of "through and under" the reservation of rights here includes the right "to enter in and upon the above-described real estate." (ECF No. 2-2, PageID 29.) EOG suggests that this language is "broader" and expressly allows EOG to conduct its oil and gas activities "upon" Lucky's property. (Reply, PageID 321.)

Since the language in the severance deed in *Jewett* is distinguishable, *Jewett* also does not instruct the Court how to interpret the Severance Deeds here. Case law thus does not remove the ambiguity and the Court now turns to a review of Lucky's offered rule of construction.

### iii. Construing the Severance Deeds Against the Grantor Supports the Conclusion that the Deeds are Ambiguous

After a court reviews the extrinsic evidence presented by the parties, the Court turns to guiding principles or rules of construction to determine the parties' intent. *Terlecky v. Nat'l City Mortg. Co. (In re Doutt)*, Nos. 09-64616, 10-2198, 2012 Bankr. LEXIS 4077, at *16 (Bankr. S.D. Ohio Aug. 31, 2012) (interpreting Ohio law and finding ambiguous contracts should be construed against the drafter). One such rule of construction cited by Lucky is that a reservation of rights in a conveyance is construed in favor of the grantee and against the grantor. *Am. Energy Corp. v. Datkuliak,* 2007-Ohio-7199, ¶ 75, 174 Ohio App. 3d 398, 416, 882 N.E.2d 463, 477 (Ohio Ct. App. 2007) (citing *Pure Oil Co. v. Kindall*, 116 Ohio St. 188, 203 (1927)). Lucky

argues that if the Court finds ambiguity in the reservation of rights, as it does, it should construe the Severance Deeds against EOG. (Opp., PageID 250.)

This rule of construction supports the Court's interpretation that the Severance Deeds do not include an express right to use the surface estate to drill for oil and natural gas on neighboring properties. Without an express right to horizontally drill, to prevail on the merits, EOG must show that it has an implied right to use the surface estate to drill under other adjacent properties to extract oil and natural gas. Thus, the Court must analyze EOG's implied right as the holder of the mineral estate.

### C. EOG's Implied Right

EOG argues that its proposed use, to construct two well pads to horizontally drill and produce oil from the neighboring properties, falls within its implied right to use the surface as reasonably necessary. (Mot., PageID 208.) EOG contends that Lucky's current posture preventing it from accessing the surface to commence development of its drilling operation amounts to an impermissible interference with EOG's right to reasonably access the surface. (Mot., PageID 209–10.) Lucky responds EOG has no implied right to use its property to access and produce oil and natural gas from neighboring properties. (Opp., PageID 254–55.)

To support its position, Lucky cites case law from the Ninth Circuit and the West Virginia Supreme Court of Appeals. First, the Ninth Circuit has held it is a "well established principle" that a mineral lease "does not carry with it the right to use the surface in aid of mining or drilling operations on other lands." *Russell v. Tex. Co*., 238 F.2d 636, 642 (9th Cir. 1956), *cert. denied*, 354 U.S. 938, 77 S. Ct. 1400 (1957). Applying its decision in *Russell*, the Ninth Circuit read a mineral lease narrowly as providing only the limited right to extract steam and steam by-products from the surface of a plaintiff's property—not neighboring land. *Geysers Dev. P'ship v. Geysers Power Co., LLC*, 805 F. App'x 489, 491 (9th Cir. 2020). The court noted that

16

the lease "failed to contravene" the principle from *Russell* that a mineral lease does not carry

with it the right to use the surface to mine or drill on other lands. *Id.*

Lucky also cites a West Virginia court that held "a mineral owner or lessee does not have

the right to use the surface to benefit . . . drilling operations on other lands, in the absence of an

express agreement with the surface owner permitting those operations." *EQT Prod. Co. v.

Crowder*, 241 W. Va. 738, 748, 828 S.E.2d 800 (W. Va. 2019). The West Virginia court noted

that neither the mineral lease nor severance deed included express language allowing the surface

estate to be used for the extraction of minerals from neighboring lands. *Id.* at 748. Since the right

to use a surface to drill under neighboring lands must be expressly obtained (i.e., there is no

implied right), and there was no express agreement, the Court declined to expand EQT's rights to

the surface. *Id.* at 749.

Neither is binding precedent on this Court, and there is no analogous Sixth Circuit case

law. However, as explained in the next section, because the Court finds EOG's proposed use

gives due regard for Lucky's competing interest, the Court need not make an express finding as

to EOG's implied right.

### D.  EOG's Proposed Use Gives Due Regard to Lucky's Competing Interest

The Court must evaluate whether EOG's proposed use of the surface exceeds what is

reasonably necessary for EOG to enjoy its right to the mineral estate. It is well-settled law in

Ohio that the owner of a mineral interest has the right to use the surface to develop and produce

minerals, while exercising due regard for the owner of the surface. *Snyder v. Ohio Dept. of Nat.

Res.*, 140 Ohio St. 3d 322 (Ohio 2014). "Unless the language of the conveyance by which the

minerals are acquired repels such construction, a severed mineral estate is considered to include

those rights to use of the surface as are reasonably necessary for the proper working of the mine

and the obtaining of the minerals." *Quarto Mining Co. v. Litman*, 42 Ohio St.2d 73, 83 (Ohio 1975).

The amount of surface EOG plans to use is not more than is reasonably necessary. *See* 1 Williams & Meyers, Oil and Gas Law § 218 (collecting cases and summarizing reasonable uses of the surface). Reasonable uses of the surface include cutting trees at the site of a well, taking water necessary for the exploitation of the minerals, housing employees on the premises, constructing roads to the drill site, placing signs that indicate the mineral lessee's right to drill, and drilling vertical wells. *Id.*; *see*, *e.g.*, *Gulf Ref. Co. v. Davis*, 224 Miss. 464, 467, 80 So. 2d 467, 468 (1955) (allowing lessee to cut trees for construction of saltwater pit); *Russell*, 238 F.2d at 644 (noting the "abundant authority" that owner of mineral rights is entitled to take the amount of water necessary for the exploitation of the minerals); *EQT Prod. Co. v. Adams*, Civil Action No. 1:15-CV-102, 2015 U.S. Dist. LEXIS 186369, at *3 (N.D.W. Va. July 29, 2015) (enjoining surface owner from interfering with mineral lessee's roadbuilding operations); *Elite Designer Homes, Inc. v. Landmark Partners*, 2006-Ohio-4079, ¶ 40 (Ohio Ct. App. 2006) (rejecting argument that mineral owner interfered with surface rights by posting signs notifying prospective buyers of its drilling rights).

Courts have found that a mineral rights holder exceeds the reasonable use of the surface in a narrow set of cases, typically where a total disruption of the surface estate occurs. *E.g.*, *Skivolocki*, 38 Ohio St. 2d at 251 (finding strip mining incompatible with the enjoyment of the surface estate); *Quarto Mining*, 42 Ohio St. 2d at 85 (same). From the record, EOG's proposed use of the surface will not result in a total disruption of the surface estate and is not analogous to strip mining.

Importantly, from the record established at the Hearing, the proposed use of two horizontal well pads will have *less of a surface impact* than the alternative of installing 16, two-acre well pads spread out across the 313.320-acres. (*See* ECF No. 36; ECF No. 37.) EOG's proposed use, even accounting for construction, utilities, and the necessary roadways, will impact roughly 45 of Lucky's 313.320 acres. (*Id.*)

EOG also offered $100,000 to Lucky in connection with the Surface Use Agreement for the disruption it will cause and surface Lucky will be unable to use because of EOG's drilling. (*See* ECF No. 36, Exhibit J.) That offer of $100,000 for the 45-acre disruption is comparable to the $2,300 price per acre that Lucky paid to purchase the property. (Lucky Aff., ECF No. 20-2, ¶ 9.) If the Court considers only the 10 acres impacted by the placement of the well pads—given the well pad disruption will last longer than the construction disruption—that price is significantly more than the price Lucky paid per acre. EOG's $100,000 offer demonstrated further due regard for Lucky's surface rights.

As such, the Court finds that EOG's plan to install two horizontal well pads exercises due regard to Lucky as the owner of the surface. The Court also finds $100,000 an appropriate payment from EOG to Lucky as additional due regard for EOG's disruption of Lucky's surface rights, and discusses payment below.

EOG has therefore demonstrated a likelihood of success on the merits. This factors tips in favor of EOG.

## II.     Irreparable Harm Absent an Injunction

The second factor considers whether EOG will suffer irreparable injury without the injunction. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (citing *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).

19

Irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated."

*Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). A harm is irreparable if "it is not fully

compensable by monetary damages." *Id.* (quoting *Overstreet v. Lexington-Fayette Urb. County

Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). "[A]n injury is not fully compensable by money

damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Id.*

(quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

EOG claims that, without the Court's issuance of an injunction, it will suffer irreparable

harm from Lucky's interference in its right to extract minerals from the property. (Mot., PageID

211.) Without the injunction, EOG argues that it will be unable to begin clearing trees, or

constructing the well pads, which will lead to delay in the extraction and sale of oil and gas. (*Id.*)

Lucky counters that the oil and gas can be drilled and produced by conventional vertical

wells drilled on the surface of the property, rather than horizontally extracting oil from the

neighboring properties through Lucky's property. (Opp., PageID 261; ECF No. 38, PageID

1539.) Lucky posits, and EOG concedes, that EOG does not want to vertically drill because it is

more expensive. (*Id.*; *see also* ECF No. 37 (describing horizontal drilling as the "least efficient

and most expensive way" that EOG could use the property).)

Construction delays and substantial added costs warrant injunctive relief in unique

circumstances where other considerations support an injunction. For example, this Court found

that a gas company would suffer irreparable harm when the company needed to proceed with

construction of a pipeline in a particular order and where construction delays or proceeding out

of sequence could add substantial costs to the project. *Columbia Gas Transmission, LLC v.

171.54 Acres of Land*, No. 2:17-cv-70, 2017 U.S. Dist. LEXIS 30667, at *23 (S.D. Ohio Mar. 3,

2017) (Watson, J.). But in that case the Court held that unique public interest factors also favored

20

injunctive relief. *Id.* at *24 (stressing the risk of diminishing the public's supply of natural gas with construction delays). But EOG is not constructing a pipeline. The same considerations, like ensuring that the public's supply of natural gas is not diminished during the winter months, are not present here. *Id.* at *24. Without these considerations, the Court is "loathe to find that economic harm amounts to irreparable harm for purposes of granting injunctive relief." *Id.*

Thus, while the Court finds that EOG will face some harm without the issuance of an injunction, that harm is monetary or economic. EOG's argument boils down to the simple assertion that Lucky's interference will cause EOG to suffer development delays and lose profit. But "lost profits alone are calculable and compensable through monetary damages" and thus are usually not considered irreparable. *Hall v. Edgewood Partners Ins. Ctr., Inc.,* 878 F.3d 524, 530 (6th Cir. 2017). Thus, EOG has a difficult time establishing that it would be irreparably harmed without an injunction.

### III. Threat of Harm

In assessing the third factor relevant to granting a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). The substantial harm factor accounts for the burden on the defendants. *See Overstreet*, 305 F.3d at 579.

Lucky posits it would suffer substantial harm if the Court granted EOG its requested relief. Lucky argues when it purchased the surface estate, it knew that EOG possessed the mineral rights to the oil and natural gas but there was only one existing well located on the property. (Opp., PageID 260.) Now, EOG intends to develop two well pads and place them in the same location where Mr. Lucky cleared trees and installed food plots. (Reply, PageID 312; ECF

No. 38, PageID 1540.) Mr. Lucky testified that Lucky invested $300,000 to clear the trees and install the food plots. (ECF No. 38, PageID 1538.) Along with losing its investment, Lucky is concerned that EOG's construction and drilling operations would scare the white tail deer away, disrupt their mating patterns, and reduce the property's market value as a hunting ground. (Opp., PageID 263.)

Eric Hayes of Keeping it Native Land Management, LLC, an expert witness retained by Lucky, testified that he was hired to perform a site inspection and evaluate whether EOG's proposed pad locations would impact the property's wildlife and white tail deer population. (ECF No. 36, Exhibit AA.) Mr. Hayes testified that the well pads and construction would cause a portion of the white tail deer population to leave the area. (*Id*.) He also explained that his inspection showed that Lucky made improvements to the property by creating access roads and trails, as well as clearing and planting vegetation. (*Id.*) That said, Mr. Hayes described only a "small portion" of the property as improved by the habitat work, and Mr. Hayes could not confirm Mr. Lucky's assessment of the costs and expenses associated with that work. (*Id*.)

The record shows that Lucky's use of the surface as a hunting ground would be disrupted by EOG's planned development. But the Court's inquiry under this factor is not to discern whether Lucky would suffer any harm at all, but to balance the competing claims of injury. *Winter*, 555 U.S. at 24 (2008). The Court here must balance "the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (2008).

Granting EOG its requested relief and allowing EOG to clear trees, and to start construction and oil and gas production would disrupt Lucky's hunting ground and deer population. But EOG has a right to use the surface for its oil and gas operations as well, and EOG has tried to involve Lucky in decisions about its use of the surface. To maintain a good

working relationship, Jason Boykin testified that EOG offered Lucky two Surface Use Agreements, first at $40,000 and then raised that offer to $100,000 to compensate Lucky for its proposed use. (ECF No. 36, Exhibits I, J.) Lucky rejected both offers and refused to provide EOG with any input on the placement or design of the well pads, access roads, or other infrastructure. (*See* ECF No. 37, PageID 1535.)

In balancing the competing harms to the parties, the Court agrees that Lucky will suffer harm that typically would counsel against granting EOG injunctive relief. At the same time, EOG will also suffer harm and Lucky had opportunities to mitigate its harms by providing EOG input on the design, location, or placement of the well pads, or by entering into a Surface Use Agreement with EOG.

The third factor is therefore neutral.

## IV.    Public Interest

Lastly, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). EOG argues that public interest justifies granting injunctive relief because granting such relief would instill confidence in the property rights granted in deeds and leases. (Mot., PageID 212.) EOG correctly notes that there is a public interest in enforcing contracts. *See, e.g.*, *Stryker Emp't Co., Ltd. Liab. Co. v. Abbas*, 60 F.4th 372, 386 (6th Cir. 2023). Lucky does not argue this factor.

As this Court analyzed above, the Severance Deeds do not unambiguously provide EOG with the right to drill oil and natural gas from neighboring properties. Accordingly, this last factor is also neutral.

23

**CONCLUSION**

In conclusion, the balance of the four factors tips in EOG's favor. Although a close call, the Court finds that EOG has a strong likelihood of success on the merits because EOG demonstrated that its proposed use of the surface gives due regard to Lucky's use of the surface. Likelihood of success on the merits is often the most important factor. *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009). Thus, even though the Court finds that the second factor (irreparable harm) is not entirely clear, and that the remaining two factors are neutral, the balance favors granting EOG injunctive relief. Therefore, this Court **GRANTS** EOG's Motion for a Preliminary Injunction (ECF No. 3).

Each party in this case owes the other due regard to the other's property interest. *Snyder.*, 140 Ohio St. 3d 322. EOG will necessarily disrupt the surface interest held by Lucky. EOG offered $100,000 to Lucky for such disruption, much of which will be temporary. (*See* ECF No. 36, Exhibit J.) The Court finds this amount an appropriate payment as due regard for Lucky's interest and orders that sum to be paid.

The Court also considers the bond requirement under Rule 65(c) which states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 953 (6th Cir. 2007) (noting that the bond requirement is discretionary, but the district court must consider the question if a party raises the issue).

EOG argues no bond is required. (Mot., PageID 212–13.) Lucky's opposition brief mentions that "EOG does not even believe that it should be required to provide a bond," but

24

provides no further analysis on what bond it believes would be appropriate. (Opp., PageID 268.)

Based on the evidence before this Court, the Court finds a $300,000 bond appropriate.

For the reasons above, EOG Resources, Inc.'s Motion is **GRANTED.** (ECF No. 3.)

Specifically,

(1) Defendant Lucky Land Management, LLC, and its agents, employees, assigns, and all others acting in concert and participation with them, are **PRELIMINARILY ENJOINED** from barring or otherwise interfering with EOG's reasonable use of the surface of the property in connection with its lease of the severed oil and gas rights underlying the property.

(2) Lucky is **ORDERED** to cooperate, and meet and confer, with EOG to determine viable and appropriate locations for the two well pads. The parties are **ORDERED** to submit their proposed plan with the location of the two well pads within 14 days of this Order.

(3) EOG and Lucky are also **ORDERED** to meet and confer and continue to negotiate the terms of the Surface Use Agreement that EOG previously offered to Lucky and Lucky rejected. (*See* ECF No. 36, Exhibit J.) The parties shall also submit to the Court an update on their progress towards reaching a Surface Use Agreement within 14 days of this Order.

(4) EOG is **ORDERED** to pay to Lucky $100,000 for the due regard of the surface interest held by Lucky.

(5) It is further **ORDERED** that pursuant to Fed. R. Civ. P. 65(c), EOG shall file with the Clerk of this Court a $300,000 bond as security. If Lucky is later found to have been wrongfully enjoined, the Court may hold a hearing on the issue of costs and damages owed by EOG to Lucky and adjust the amount accordingly.

**IT IS SO ORDERED.**

2/23/2024                                   **s/Edmund A. Sargus, Jr.**
**DATE**                                    **EDMUND A. SARGUS, JR.**
                                              **UNITED STATES DISTRICT JUDGE**